# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

TIMOTHY R. KNIGHT,        )
      Plaintiff,           )
                          )
      v.                 )        CAUSE NO.: 2:14-CV-465-PRC
                          )
CAROLYN W. COLVIN,       )
Acting Commissioner of the    )
Social Security Administration,   )
      Defendant.         )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Timothy R. Knight on December 22, 2014, and an Opening Brief [DE 19], filed by Plaintiff on June 4, 2015. Plaintiff requests that the July 9, 2013 decision of the Administrative Law Judge denying his claim for disability insurance benefits and supplemental security income be reversed and remanded for further proceedings. On September 10, 2015, the Commissioner filed a response, and Plaintiff filed a reply on October 1, 2015. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for disability insurance benefits and supplemental security income on June 24, 2011, alleging an onset date of April 24, 2011. His claims were denied initially and upon reconsideration. Plaintiff timely requested a hearing, which was held on June 3, 2013. In attendance at the hearing were Plaintiff and an impartial vocational expert by telephone. On July 9, 2013, Administrative Law Judge ("ALJ") Harry Kramzyk issued a written decision denying benefits, making the following findings:

    1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

    2.      The claimant has not engaged in substantial gainful activity since April 24, 2011, the alleged onset date.

3.      The claimant has the following severe impairments: a major depressive disorder, an anxiety-related disorder including a panic-attack disorder with agoraphobia, and polysubstance use disorders.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is able to understand, remember and carry out short, simple, repetitive instructions; can sustain attention/concentration for 2-hour periods at a time and for 8 hours in the workday on short, simple, repetitive instructions; can use judgment in making work decisions related to short, simple, repetitive instructions; requires an occupation with set routine and procedures, and few changes during the workday; requires an occupation with only superficial contact with the public on routine matters; and no fast paced production work; can maintain regular attendance and be punctual within customary tolerances; and can perform activities within a schedule.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born [in 1965] and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 24, 2011, through the date of this decision.

(AR 14-24).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*,

705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If no, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if no, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity ("RFC"), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the

burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal and remand for further proceedings, arguing that (1) the ALJ should have found him disabled under Listings 12.04 and 12.06, (2) the RFC is not supported by substantial evidence, and (3) the credibility determination is deficient. The Court considers each in turn.

### A. Listings 12.04 and 12.06

At step three of the sequential analysis, the ALJ considered whether Plaintiff met or equaled Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders), finding that, under the paragraph B criteria, Plaintiff had (1) mild restrictions in activities of daily living, (2) moderate difficulties in social functioning, (3) moderate difficulties with concentration, persistence, or pace, and (4) no episodes of decompensation. The ALJ found that Plaintiff did not meet either Listing because he did not have a combination of either two ratings of "marked" in the first three categories or a rating of "marked" in at least one of the first three categories as well as "repeated episodes of decompensation, each of extended duration." *See* 20 C.F.R. § Pt. 404, Subpart P Appx. 1, §§ 12.04, 12.06. Plaintiff argues that the ALJ erred in finding that he had no episodes of decompensation and in finding only moderate difficulties in social functioning; if he had been found to have marked difficulties in social functioning and repeated episodes of decompensation, each of extended duration, he would have met a Listing.

### 1.    *Episodes of Decompensation*

"Episodes of decompensation" is defined in the regulations as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining

concentration, persistence, or pace." 20 C.F.R. § Pt. 404, Subpart P Appx. 1, § 12.00.C.4. These episodes can be "demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combintation of the two). *Id.* "Repeated episodes of decompensation, each of extended duration" as that term is used in the Listings for mental impairments "means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* The Listing further explains that, if the claimant experiences more frequent episodes of shorter duration or less frequent episodes of longer duration, the ALJ must use "judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." *Id.* These episodes may also be inferred from medical records that show "significant alteration in medication," from documentation of the need for a more structured psychological support system, or from other relevant information in the record about the existence, severity, and duration of the episode. *Id.*

In finding no episodes of decompensation, the ALJ noted that Plaintiff was hospitalized twice as a result of his severe mental impairments but found that neither was of sufficient duration. (AR 19). The ALJ also found that, in both instances, Plaintiff "rapidly improved with appropriate treatment such that the severity of the decompensatory event does not meet the level of severity required under Listing 12.00." *Id.* (citing Ex. 1F, 2F (AR 223-48, 249-82)). The Court finds that substantial evidence supports the ALJ's determination that Plaintiff did not experience "repeated episodes of decompensation, each of extended duration."

Although Plaintiff is quick to note his two hospitalizations, he fails to explain that the first lasted just one day, from March 9 to March 10, 2011, and the second lasted three days, from July 5 to July 8, 2011. *See* (AR 251-72, 273-82). Neither hospitalization lasted the requisite two weeks.

Plaintiff also makes much of his treating psychologist's statement that the harassment Plaintiff experienced at his work resulted in psychological decompensation to the level that he was psychiatrically hospitalized." (AR 375). That hospitalization was the first hospitalization from March 9 to March 10, 2011, and was not a separate, third event.

Plaintiff suggests that the ALJ did not properly exercise his judgment regarding other events that could be considered as functionally equaling the episodes of decompensation necessary to meet a Listing. Plaintiff notes the events surrounding the harassment at work that lead him to quit his job and be hospitalized, suggesting that together the events constitute an episode of decompensation of longer duration. Plaintiff also notes that he continued to have self-inflicted burns in 2011, that his medications were occasionally changed, and that he continued to experience distress in both social and public settings. Plaintiff's treating therapist, Brian Dieckmann, Psy.D., opined on January 12, 2012, that "[a] return to work at this time may set [Plaintiff] up for job related failure directly related to returning to a setting associated with traumatic experiences and the associated psychological decline." (AR 375). During each hospitalization, Plaintiff reported having injured himself and both hospitalizations resulted in a change of medication.

However, none of these events alone or in combination are significant enough to challenge the ALJ's judgment as to episodes of decompensation. For example, Plaintiff notes changes in his medications Abilify and Celexa but offers no evidence or argument that they were anything other than changes from an initial to a recommended dosage or a routine adjustment in the course of treatment; in other words, he has not demonstrated that the increase was "significant." In his reply brief, Plaintiff points to medication changes on March 9, 2011, but that is the day that Plaintiff was admitted for his first hospitalization. (AR 235-36, 237). Even if the month period in which Plaintiff was adjusting to medication constituted an episode, Plaintiff did not suffer repeated episodes. The

two hospitalizations occurred at the outset of his mental health treatment and were not repeated over the course of two years before the ALJ's decision. Also, as correctly recounted by the ALJ, several of Plaintiff's behaviors improved, including incidents of self-harm, and he showed clinical improvement with using several techniques. Although, as discussed in more detail below, Plaintiff continued to suffer severe symptoms regarding social functioning, there were no exacerbations or temporary changes that would rise to the level of an episode.

Plaintiff argues that the ALJ improperly relied on the September 20, 2011 opinion of Dr. Kladder, the state agency doctor, that there were no episodes of decompensation because it is not clear whether Dr. Kladder had access to the hospitalization records. *See* (AR 314). However, Plaintiff's speculation is belied by the content of the records Dr. Kladder specifically discusses, namely (1) the Mental Status Examination of Dr. McKian, dated September 6, 2011, which details the hospitalizations (describing them each as "one week" in duration), and (2) the June and July 2011 records from treating psychiatrist Dr. Hess and treating psychologist Dr. Dieckmann, which note the July hospitalization. *See* (AR 291, 293, 295, 298). Dr. Kladder also discussed the content of the treatment notes from June 2011, including Plaintiff's daily activities as recounted to Dr. Dieckmann during therapy. (AR 314). Although Dr. Kladder did not mention the hospitalizations in his report, given that the hospitalizations were reported as being of only a week in duration, the evidence supports his finding that there were no episodes of decompensation.

Unlike in *Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010), cited by Plaintiff, no medical source, treating or otherwise, opined that Plaintiff had "repeated episodes" of decompensation that equal a Listing. Thus, this is not a case in which a medical source found sufficient episodes of decompensation and the ALJ found otherwise.

Finally, Plaintiff argues that he did not experience the vast "improvement" suggested by the ALJ. Although he was not relieved of all symptoms following the two hospitalizations, such as the amount of time he spent in bed, burning himself for several months afterwards, or his ongoing difficulties with social functioning, the records show that Plaintiff significantly improved following each hospitalization, and the ALJ accurately discussed the hospitalization records in the decision. For example, the ALJ noted the improvement of Plaintiff's GAF scores from 20 upon admission to 50 upon discharge for both hospitalizations. *See* (AR 21, 256, 274-75). The ALJ also noted that, as Plaintiff "became more compliant with treatment and abstinence from substances, his GAF scores improved such that they have consistently ranged in the mid-fifties." (AR 21 (citing Exs. 9F, 15F)); (AR 330-71, 388-475). The ALJ then noted that Plaintiff's "trend towards improvement continued in 2012." (AR 22 (citing Ex. 15F)); (AR 388-475). The ALJ noted, as is supported by the record, that Plaintiff had "continued success at using coping techniques and relaxation exercises to avoid engaging in self-harming behavior as he had done in the past, even in spite of decreased frequency of treatment sessions." (AR 22 (citing Ex. 15F)). The ALJ did not ignore the fact that Plaintiff continued to have difficulties, despite improvement since hospitalization, noting that Plaintiff continued to have physical shakiness, difficulty quieting his mind before sleeping, and difficulty tolerating the social interaction involved with a garage sale.

The Court will not re-weigh the evidence that was properly considered by the ALJ. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) ("We do not reweigh the evidence or substitute our own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, we must uphold the decision under review."). Substantial evidence supports the ALJ's finding that Plaintiff did not suffer repeated episodes of decompensation, each of extended duration.

*2.      Social Functioning*

Under the Listings, "social functioning" describes a claimant's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. 20 C.F.R. § Pt. 404, Subpart P. Appx. 1, § 12.00. Impaired social functioning may be demonstrated by "a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation." *Id*. In contrast, strength in social functioning may be demonstrated by the "ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities." *Id*. A "marked" limitation in social functioning is not defined by a specific number of different behaviors but rather "the nature and overall degree of interference with function." *Id*.

The ALJ found that Plaintiff has moderate difficulties in social functioning; Plaintiff argues that the evidence supports a finding of marked difficulties in this category. In his decision, the ALJ acknowledged the record evidence that Plaintiff avoids crowds, is socially isolative on a daily basis, lacks motivation to get out of bed, and exhibits some shaking and crying behavior in the presence of treating professionals. (AR 18). However, the ALJ also found that, in the presence of appropriate treatment, Plaintiff "attends social get-togethers with family and friends, communicates with people via Facebook, attends public events such as the circus, and goes to Wal-Mart and grocery stores to shop for needed items." (AR 18) (citing Ex. 4E, 4F, 5R, 9F, 15F).

When scrutinized, the evidence of record does not support the ALJ's characterization of Plaintiff's social functioning. The ALJ discounts the severity of Plaintiff's agoraphobia and social isolation by cherry picking the only social events in the record and paints them as illustrative of a much richer social life.

First, the reference to a social get-together and Facebook is from Dr. Dieckmann's June 22, 2011 treatment record that Plaintiff went to a barbeque with some friends he reconnected with on Facebook. However, the same treatment record explains that he "was encouraged to process[] . . . his anxiety around going to the bar-b-q." (AR 290). Two weeks later was his second hospitalization. In August 2011, Plaintiff reported to Dr. Dieckmann that he had to leave a wake after 20 minutes because "he had to get out." (AR 337). Plaintiff attended the circus with friends in approximately November or December 2011, but he went to an early performance that was less well attended and reported that "he could not have done it without Xanax." (AR 361). In May 2012, Plaintiff reported to Dr. Dieckmann that he had recently been at his friend's house helping with yard work when he realized a garage sale with over thirty people was going on at the house; he had a panic attack and had to leave. (AR 391). At the same visit, Plaintiff reported that he did not plan to go to a Memorial Day party in Chicago because it would have required taking the South Shore train and the "L," to which he commented: "not like that won't turn out bad." (AR 391). Plaintiff reported on December 15, 2011, that he was going to be picked up by his brother for Christmas to spend time with his family, (AR 354), and in January 2013, Plaintiff reported that he spent the holidays with his brother's family, (AR 441). However, in his testimony, he stated that he only sees his family on holidays, indicating that these were uncommon events. In the January 2013 note, Plaintiff reported that his only outing was to visit a friend. (AR 441). The only reference to Wal-Mart is in the May 26, 2013 treatment note by Kimberly Meyer, M.D. (who replaced Dr. Hess as Plaintiff's treating psychiatrist in Spring 2012) that Plaintiff's last outing was to visit a friend, being to Wal-Mart. (AR 445). In his testimony, Plaintiff explained that he usually does his grocery shopping at midnight so that he can avoid crowds of people. (AR 53, 55).

When the events cited by the ALJ are examined, the evidence depicts an individual who leaves social situations immediately when he encounters a crowd, attends family functions only at the holidays, and shops late at night to avoid crowds, all of which appears to constitute fear of strangers, fear of crowds, avoidance of interpersonal relationships, and social isolation. The ALJ's downplay of the facts to support a finding of only moderate limitations suggests that Plaintiff in fact has marked limitations in social functioning. In addition, as discussed in the next section below, the ALJ interpreted the treatment records regarding social functioning in a manner inconsistent with the treating physicians' medical source statements, which also support marked limitations in social functioning. *See Mason v. Barnhart*, 325 F. Supp. 2d 885, 900, 904 (E.D. Wis. 2004). This is not a matter of the ALJ not discussing every piece of evidence, as suggested by the Commissioner, *see* (Def. Br. 5 (citing *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009)), but rather the ALJ implying that the evidence discussed means something other than what appears on its face to support a finding of moderate rather than marked limitations. Thus, because the ALJ did not provide a complete picture of these limited events, the ALJ did not built an accurate and logical bridge between the evidence and his conclusion. *See Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

However, to the extent the step three determination is concerned, the error regarding the degree of limitation in social functioning is harmless. Because there is not another marked limitation in a functional area or sufficient episodes of decompensation, even if the ALJ had found that Plaintiff had a marked limitation in social functioning, Plaintiff would not have met a Listing. Therefore, the ALJ did not err in finding that Plaintiff's impairments do not meet Listings 12.04 and 12.06. But, as discussed in the next section, a marked limitation in social functioning does impact the RFC.

## B. Residual Functional Capacity

Plaintiff argues that the ALJ erred in formulating his RFC by improperly weighing the opinions of his treating doctors, arguing that the ALJ inflated Plaintiff's social capabilities, erroneously suggested Plaintiff's condition improved, and relied on unsupported state agency opinions.

The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process and must be supported by substantial evidence. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996); *Clifford*, 227 F.3d at 870.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p at *1. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id.*

As for Plaintiff's mental RFC, the first ALJ gave "partial weight" to the state agency psychological consultant's mental assessment, finding that it was not sufficiently restrictive on the basis that the evidence supported not only limitations in social interaction but also in the ability to concentrate and persist in work activity. Plaintiff does not dispute this determination.

However, Plaintiff argues that the ALJ then erred by giving only "little weight" to the January 1, 2012 medical source statement of his therapist Dr. Dieckmann, and the January 17, 2012 medical source statement of his psychiatrist Dr. Meyer, both of whom treated Plaintiff at Regional Mental Health and both of whom opined that Plaintiff had, at best, fair, poor, or no ability to consistently engage in work activity. (AR 22-23). Both doctors checked the box for "poor/none" for Plaintiff's ability to relate to co-workers, deal with the public, deal with work stresses, and relate predictably in social situations. (AR 373-74; 377-78). Dr. Meyer additionally checked "poor/none" for the ability to interact with supervisors; function independently; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex, job instructions; and behave in an emotionally stable manner. (AR 377-78). In his "basis for assessment," Dr. Dieckmann explained that Plaintiff's symptoms increased in early 2011 as a result of a hostile work environment that "resulted in psychological decompensation to the level that he was psychiatrically hospitalized." (AR 375). Dr. Dieckmann commented that Plaintiff "experiences significant distress in social and public settings. A return to work at this time may set [Plaintiff] up for job related failure directly related to a setting associated with traumatic experiences and the associated psychological decline." *Id*. Dr. Meyer based her assessment on the diagnoses of major depressive disorder and panic disorder and on the stressors of being unemployed, having difficulty accessing health care, and financial difficulties. Dr. Meyer completed a second medical source statement over a year later on April 24, 2013, giving the same opinion.

An ALJ must give the opinion of a treating doctor controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). If an ALJ determines that controlling weight is not appropriate, the ALJ must then decide what weight to assign to the opinion. 20 C.F.R. §§ 404.152(c), 416.927(c);SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

The reason given by the ALJ for assessing "little weight" to the medical source statements of Dr. Dieckmann and Dr. Meyer was that the opinions "are not consistent with the [doctors'] own notations of progress made by the claimant in psychotherapeutic treatment both as regards his ability to socially interact and his ability to concentrate upon and persist in activity." (AR 23). The ALJ supported this reasoning by citing Exhibits 10F, 11F, and 16F. However, those exhibits are not treatment records but rather are the three medical source statements themselves. More importantly, the ALJ provided no explanation of how or which portions of the doctors' treatment records are inconsistent with their opinions.

The ALJ is correct that Plaintiff was stabilized after his hospitalizations and showed improvement in his ability to use certain techniques to improve his attitude and avoid self harm. For example, Plaintiff's thoughts of self-harm or infliction of self-harm continued for several months in 2011 but then stabilized. *See* (AR 337) (8/25/2011) (self-harm); (AR 339) (9/8/2011) (self-harm); (AR 346, 350) (10/20/2011) (self harm); (AR 354) (12/15/2011) (no self-harm); (AR 396) (8/9/2012) (same); (AR 401) (10/4/2012) (same); (AR 403) (10/18/2012) (same); (AR 404) (11/15/2012) (same). In June 2012, Dr. Dieckmann noted that interventions appeared effective

because Plaintiff took the lead in making comments about his progress and was more accurately able to appraise his growth. (AR 393).

However, the records do not suggest significant improvement in his ability to function socially. The more recent records continue to note that Plaintiff spent the majority of his day at home, watching television, and playing with his cat, in isolation. *See* (AR 403, 405-06, 439). In the paragraphs leading up to the weighing of the opinion evidence, the ALJ discussed the treatment records and noted, as he did at step 3, that Plaintiff shopped at Wal-mart and visited with his one friend to show improvement in his symptomology, "particularly as regards his ability to persist in activity and engage in social interaction." (AR 22). However, as discussed in the previous section, the ALJ misstated the record by stating that Plaintiff "tolerat[ed] the social interaction involved with a garage sale," when in fact he left the friend's house with a panic attack when he observed the crowd of people in May 2012. (AR 22); (AR 391) (5/17/2012). Although the ALJ represents that there were "repeat" outings with a friend, there is only one record of going to Wal-mart, and the reports to Dr. Dieckmann of seeing his one friend are sporadic. Although Plaintiff saw his family at the Christmas holiday both years, the ALJ's finding that Plaintiff engaged in "family social gatherings" implies more than the limited nature of the two events. (AR 22). There are only a few other references to socialization in the record—an outing to the circus that required Plaintiff to medicate with Xanax to make it through the show, a barbeque that Plaintiff described as a stressor to Dr. Dieckmann, and a wake that Plaintiff had to leave after 20 minutes. There was also one time when Plaintiff socialized with neighbors, but he first purchased vodka to be able to engage in the social interaction. (AR 396). The ALJ also suggested that Plaintiff reinstating his drivers license somehow demonstrates social interaction; but the record does not indicate whether Plaintiff reinstated his license online or in person. These sporadic events, which took place over two years,

are not inconsistent with the treating medical source statements of Dr. Dieckmann and Dr. Meyer, nor do they suggest progress in social functioning.

As noted by the ALJ, Plaintiff continued to display shaking or nervous affect with Dr. Dieckmann. *See* (AR 345) (9/22/2011); (AR 361) (12/15/2011); (AR 363) (1/12/2016); (AR 388) (4/5/2012); (AR 395) (7/12/2012); (AR 396) (8/9/2012); (AR 397) (8/23/2012); (AR 404) (11/15/2012). And, Plaintiff remained isolated. On May 31, 2012, Dr. Dieckmann noted that Plaintiff reported continued experiences of anxiety and panic. (AR 392). On June 14, 2012, Plaintiff reported more isolation and that his anxiety had not improved.(AR 393). On August 23, 2012, Plaintiff reported increased feelings of anxiety and poor sleep and that he "has not felt right in at least two weeks." (AR 397). On October 4, 2012, Plaintiff reported that he remained isolated and nervous of others. (AR 401). On October 18, 2012, Plaintiff reported remaining isolated although feeling less depressed over the previous week. (AR 403).

On both November 29, 2012, and December 13, 2012, Plaintiff presented as appearing within normal limits within most areas, and his affect was normal with some restricted affect. (AR 405, 406). However, Plaintiff reported that he continued to isolate himself in his apartment. *Id*. Although Plaintiff's therapy sessions with Dr. Dieckmann ended because he had reached the maximum number of visits permitted under Medicaid, he continued to see Dr. Meyer for medication. And, in April 2013, Dr. Meyer gave Plaintiff the same ratings in an updated medical source statement, indicating that Plaintiff could not work. (AR 477). Dr. Meyer's treatment notes for January 29, 2013, and February 26, 2013, show reports of feeling better, keeping busy around the house, feeling sad on his mother's birthday, no crying spells, sleeping better, and a good appetite. But, Plaintiff's only outing was the trip to Wal-Mart. (AR 443, 445).

18

The Commissioner's response brief wholly fails to address Plaintiff's criticism of the ALJ's assessment of Plaintiff's social functioning. *See* (Def. Br. 6). Instead, the Commissioner quotes the ALJ's reasoning at step three regarding the other functional areas of "activities of daily living" and "concentration, persistence or pace," neither of which Plaintiff is challenging. *See* (Def. Br. 6 (quoting AR 18, 19)).

In this case, the only reason given by the ALJ for discounting the opinions of Dr. Meyer and Dr. Dieckmann is that the opinions are inconsistent with their own treatment records. An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ gives good reasons. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schaaf*, 602 F.3d at 875; *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). The ALJ in this case did not give good reasons because he did not explain how the opinions are inconsistent with the treatment records, and, the ALJ's conclusions about improvement in social functioning are not supported by substantial evidence. Nor is there other substantial evidence in the record that contradicts or conflicts with the opinions. SSR 96-2p. Thus, substantial evidence does not support the weight given by the ALJ to the treating mental health opinions.

When a treating source's opinion is not given controlling weight, the ALJ must apply several factors to determine the weight to give the opinion and must give good reasons for the weight given to the treating source's opinion. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Schaaf*, 602 F.3d at 875. The factors are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case. 20 C.F.R. §§ 404.1527(c), 416.927(c). Plaintiff argues that the ALJ erred by not explaining how these factors

19

were applied. In this case, because the reason given by the ALJ is not supported by the evidence, the absence of any discussion of how the ALJ weighed these factors is palpable. *Compare Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) ("The ALJ did not explicitly weigh every factor while discussing her decision to reject Dr. Preciado's reports, but she did note the lack of medical evidence supporting Dr. Preciado's opinion, and its inconsistency with the rest of the record. This is enough."). Dr. Dieckmann treated Plaintiff biweekly for 18 months, and Dr. Meyer treated him for over a year. Both were knowledgeable about Plaintiff's repeated self-inflicted wounds, hospitalizations, and social phobia. Moreover, the doctors' medical source statements are remarkably similar and, thus, are consistent with each other. *Compare Herrmann v. Colvin*, 772 F.3d 1110, 1111 (7th Cir. 2014). Generally, the more consistent an opinion is with the record as a whole, the more weight it is given. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). Thus, the ALJ's failure to discuss any of the other factors leaves the Court with no basis on which to find that the assigned weight is supported by substantial evidence. Remand is required for a proper consideration of the opinions of treaters Dr. Meyer and Dr. Dieckmann.

Plaintiff also argues that his social limitations impact the availability of jobs. He reasons that the job of kitchen helper identified by the vocational expert "seems pretty similar" to his prior employment with the exception of some of the job responsibilities. Similarly, Plaintiff notes that a hospital cleaner works in a hospital where there are large numbers of people, and that the position of janitor may also require being near large groups of people. Thus, Plaintiff argues that, because his difficulties with crowds of people were not properly factored into the RFC, these jobs may not be appropriate in light of his social limitations. Because this case is being remanded, the ALJ will have an opportunity to clarify with the vocational expert, if necessary, whether the available jobs sufficiently account for Plaintiff's social limitations.

As for his physical RFC, Plaintiff contends that gout should have been considered severe at step two or incorporated in the RFC. On September 16, 2011, state agency consultant Dr. Sands opined that Plaintiff did not have a severe physical impairment. (AR 311). The ALJ gave his physical assessment "great weight" on the basis that it was consistent with the record as a whole. (AR 22). At step two, the ALJ concluded that Plaintiff's gout was not "severe," noting that there was no imaging of the joints, "treatment has been exceedingly conservative, consisting essentially of nothing other than an ongoing regimen of Meloxicam which predates both the claimant's alleged onset date and cessation of substantial gainful activity," and that assessments of Plaintiff's gait and peripheral joint function consistently indicate that his gait is normal, his joint range-of-motion is within functional limits, and his fine-motor function is intact. (AR 17-18). These statements are supported by the evidence of record.

Plaintiff remarks that "gout" is noted many times in the record, citing pages 48, 59-60, 308-10, 479-81, and 492 of the administrative record. While these citations reference gout, none requires reversing the ALJ's determination. The first page cited is Plaintiff's testimony that he takes medication for his gout. (AR 48). However, there is no testimony or evidence that his gout is *not* controlled with medication and diet, and, in fact, he testified that it is controlled. (AR 59-60). The reference to gout at page 308 of the record is Plaintiff's recitation of his medical history to consultative examiner Dr. A. Perez; Dr. Perez's physical examination findings of Plaintiff's extremities were all normal. (AR 308-10). On a July 6, 2012 treatment record, there is a notation of "Gout NOS" under "current problems," and the same record lists the Meloxicam prescription to treat gout. (AR 479-80). Another citation is to the February 23, 2011 treatment note from his regular treating nurse practitioner for his hypertension that he had a "past history" of "gouty arthritis"; however, there is no record of treatment at that time for gout. (AR 492). The last citation is to

Plaintiff's testimony about his ability to stand, but Plaintiff fails to note his testimony that his gout is controlled as long as he eats a proper diet. (AR 59-60). Plaintiff also notes that his former employer reported that he called off of work four to five times a year because of gout. (AR 196). But, he nevertheless maintained his employment for 15 years.

The ALJ did not err in the physical RFC with regard to Plaintiff's gout as it appeared to be under control with medication. Nor did the ALJ err in giving great weight to the state agency medical consultant's physical assessment.

## C. Credibility Determination

In making a disability determination, the ALJ must consider a claimant's statements about his symptoms, such as pain, and how the symptoms affect his daily life and ability to work. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . . a court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler*, 688 F.3d at 310-11 (quotation marks omitted) (quoting *Skarbek*, 390 F.3d at 504-05); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons

supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry*, 580 F.3d at 477); SSR 96-7p, 1996 WL 374186, at *2 (Jul. 2, 1996) ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").

First, Plaintiff argues that the ALJ used the impermissible boilerplate language. The ALJ did not as there is no reference to the RFC in the ALJ's introduction to the credibility determination. Rather, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely *credible for the reasons stated in this decision*." (AR 20) (emphasis added). This is precisely the type of analysis the Seventh Circuit Court of Appeals requires. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012).

Next, Plaintiff argues that the ALJ did not specify which parts of his testimony were not credible. However, the ALJ discussed Plaintiff's improvement following his hospitalization and that as Plaintiff "became more compliant with treatment and abstinence from substances," his condition improved. (AR 21). As discussed above, the ALJ correctly noted that with "the benefit of ongoing psychotherapeutic counseling and his medication regimen of BuSpar, Xanax, and Abilify, [Plaintiff's] abilities towards social interaction and maintaining concentration did improve, albeit with some slowing secondary to the claimant's lack of between session compliance." (AR 21). The ALJ then detailed the treatment records in 2012 to show that Plaintiff continued to improve despite the evidence of physical shaking and difficulty quieting his mind. (AR 22). The ALJ noted Dr.

Dieckmann's treatment notations that Plaintiff continued to succeed in using coping techniques and relaxation exercises to avoid engaging in self-harming behavior. *Id.*

However, the details cited by the ALJ go to Plaintiff's ability to perform activities of daily living and maintain concentration, persistence, or pace, but, as discussed above, do not show resolution of his difficulties in social functioning. In contrast, Plaintiff made statements in the Function Report - Adult that he could not go out in public, did indoor household necessities only, avoided going out due to agoraphobia, and shopped monthly for necessities. He also reported difficulty completing tasks, with concentration, and in getting along with others. (AR 187-191). These are statements consistent with his hearing testimony two years later as well as the treatment records and opinions of Dr. Dieckmann and Dr. Meyer. On remand, the ALJ is directed to re-weigh Plaintiff's testimony regarding his social functioning once he has re-weighed the treating physician opinion evidence.

Plaintiff also argues that the ALJ discounted his credibility solely because of objective evidence. This is incorrect as the ALJ relied mostly on Plaintiff's own reports to his treating doctors, which is not objective evidence. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a).

As for the ALJ's reference to the decreased frequency in therapy sessions, Plaintiff argues that he had reached the maximum number of treatment sessions under his Medicaid coverage. However, the ALJ did not hold the decreased sessions against Plaintiff. In addition, Plaintiff continued to be seen regularly by Dr. Meyer for medication, and Dr. Meyer kept detailed records regarding Plaintiff's progress. As noted above, although Dr. Meyer noted improvement in areas, she nevertheless gave a medical source statement in April 2013 that did not support improvement.

**CONCLUSION**

Based on the foregoing, the Court hereby **GRANTS** the relief sought in the Opening Brief [DE 19], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

So ORDERED this 30th day of March, 2016.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT